IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| RAFAEL ITHIER and EGC, CORP. A/K/A EL GRAN COMBO<br><br>Plaintiffs/Counter Defendants<br><br>v.<br><br>CARLOS JUAN APONTE CRUZ A/K/A CHARLIE APONTE, et al.<br><br>Defendants/Counter Plaintiffs | Civil No. 19-2053 (JAG) |

**REPORT AND RECOMMENDATION**

This is an action for declaratory judgment. Defendant Charlie Aponte ("Aponte"), the lead singer of over 200 songs recorded by El Gran Combo, requested the payment of digital performance royalties collected and distributed by an entity called SoundExchange, Inc. ("SoundExchange") for the benefit of recording featured artists. Plaintiffs Rafael Ithier and EGC, Corp. a/k/a El Gran Combo (jointly, "Ithier") seek a declaration from the Court that Ithier—as sole owner of El Gran Combo—has the exclusive right to collect digital performance royalties intended for recording featured artists. Docket No. 1. Aponte filed a counterclaim seeking a declaration that, as a performer in El Gran Combo sound recordings, he is entitled to participate in the digital performance royalties collected and distributed by SoundExchange for the benefit of recording featured artists. Docket No. 10. The parties agree that there are no material issues of fact preventing the entry of summary judgment. Both sides have moved for summary judgment at Docket Nos. 20 and 23. The Court referred the matter to the undersigned for a Report and Recommendation. Docket No. 36. After considering the parties' submissions and the applicable law, the undersigned recommends that the Court **GRANT** Ithier's motion for summary judgment at Docket No. 23 and **DENY** Aponte's motion for summary judgment at Docket No. 20.

Case 3:19-cv-02053-JAG   Document 37   Filed 09/19/22   Page 2 of 9

Rafael Ithier, et al. v. Carlos Juan Aponte, et al.
Civil No. 19-2053 (JAG)

## I.  Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is warranted when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is considered genuine if "a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party." Velázquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 270 (1st Cir. 2014)(citation omitted). A fact is "material" if it potentially affects the outcome of the suit. American Steel Erectors, Inc. v. Local Union No. 7, 536 F.3d 68, 75 (1st Cir. 2008). However, "[c]onclusory allegations, improbable inferences, and unsupported speculation are insufficient to establish a genuine dispute of fact." Velázquez-Pérez, 753 F.3d at 270 (citations omitted). A party moving for summary judgment bears the burden of proving that there are no genuine issues of material fact and that judgment as a matter of law is warranted. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). The moving party "may affirmatively produce evidence that negates an essential element of the non-moving party's claim" or "point to evidentiary materials already on file […] that demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir.2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317)).

## II.  Uncontested Facts

Having reviewed the submissions by both sides, the Court finds that the following material facts are not in dispute:

1. Rafael Ithier created the orchestra known as El Gran Combo. Defendants' Statement of Material Facts at Docket No. 20 ("DSMF") at ¶ 1.

2. As the owner of El Gran Combo, Rafael Ithier selects the singers and musicians who are members of the band. DSMF at ¶ 2.

3. El Gran Combo is a band that typically has three singers, two saxophone players, two trumpet players, a trombone player, a bass player, a pianist, a timbales player, a conga player, a bong player, and a director. DSMF at ¶ 3.

4. For a particular recording, Rafael Ithier might bring in backup singers or chorus that are not members of the band. DSMF at ¶ 4.

5. Charlie Aponte was a singer in El Gran Combo between 1973 and 2014. DSMF at ¶ 6; Docket No. 20-4 at ¶ 15.

Case 3:19-cv-02053-JAG   Document 37   Filed 09/19/22   Page 3 of 9

Rafael Ithier, et al. v. Carlos Juan Aponte, et al.
Civil No. 19-2053 (JAG)

6. Charlie Aponte was the lead singer in about 200 songs for El Gran Combo. DSMF at ¶ 7; Docket No. 20-4 at ¶ 3.

7. Charlie Aponte has not been paid featured artist royalties by SoundExchange for El Gran Combo sound recordings in which he was lead singer or participant. DSMF at ¶ 8.

8. SoundExchange website provides that: "The term 'featured artist' refers to the group or individual most prominently featured on a sound recording, track or album.". Plaintiff's Statement of Uncontested Facts at Docket No. 24 ("PSUF") at ¶ 8.

9. None of the albums released by El Gran Combo while Charlie Aponte was in the band identified any of its members by name in the cover. PSUF at ¶ 20; Docket No. 24-1 at ¶ 4; Docket No. 24-3 at ¶ 5; Docket No. 24-4 at ¶ 5; Docket No. 24-7 at p. 18 ¶¶ 7-17.

10. The front covers of the albums only identified El Gran Combo. Charlie Aponte's name never appeared written as a featured artist in any of El Gran Combo album covers. PSUF at ¶¶ 26-27, 50-51; Docket No. 20-4 at ¶ 9; Docket No. 24-1 at ¶ 4; Docket No. 24-3 at ¶ 5; Docket No. 24-4 at ¶ 5; Docket No. 24-7 at p. 18 ¶¶ 7-17.

11. El Gran Combo and Charlie Aponte are two different artists. PSUF at ¶ 60; Docket No. 24-7 at p. 27 ¶¶ 4-9.

12. The principal artist audiences pay to see is El Gran Combo. PSUF at ¶ 61; Docket No. 20-4 at ¶ 9; Docket No. 24-7 at p. 18 ¶¶ 7-17; p. 27 ¶¶ 14-18.

13. According to the SoundExchange website "An artist is the group, band, or individual name as it appears on the release of the recording". PSUF at ¶ 75.

### III.   Discussion

At issue in this case is who is a "recording artist featured" in the El Gran Combo sound recordings entitled to the royalties collected from digital performances and to be distributed pursuant to 17 U.S.C. § 114(g)(2)(D). Ithier argues that the only featured artist is El Gran Combo and that as the owner of the band he is solely entitled to 45% of the royalties. Aponte argues that the members of the band El Gran Combo are all featured artists under the statute and are entitled to a share of 45% of the royalties. The statute does not define the term "featured artist" and the Court has not found case law on point. Both sides make a good case for their respective positions, but the legislative history of the statute undoubtedly favors Ithier's interpretation.

The Digital Performance Right in Sound Recordings Act was passed by Congress in 1995 to amend the U.S. Copyright Act in 17 U.S.C. §§ 101 et seq. Pub. L. No. 104-39, 109 Stat. 336 (1995). It was signed into law on November 1, 1995, to provide copyright protection to sound

Case 3:19-cv-02053-JAG    Document 37    Filed 09/19/22    Page 4 of 9

Rafael Ithier, et al. v. Carlos Juan Aponte, et al.
Civil No. 19-2053 (JAG)

recordings by including a new right for public performances of sound recordings by digital audio transmission. 17 U.S.C. § 106(6). Certain digital music services are now required to pay recording companies and recording artists when they transmit the sound recordings. Recording Industry Association of America v. Librarian of Congress, 176 F.3d 528, 530 (D.C.Cir. 1999). The law created a statutory license for those wishing to transmit the copyrighted work. SoundExchange, Inc. v. Muzak, LLC, 322 F.Supp.3d 72, 74 (D.D.C. 2018). This allows digital audio services to perform copyrighted sound recordings by paying predetermined royalties without having to seek separate permissions from copyright holders. SoundExchange, Inc. v. Copyright Royalty Board, 904 F.3d 41, 46 (D.C.Cir. 2018). The compulsory licensing regime is set out in Section 114 of the Copyright Act. SoundExchange is designated by regulation as the sole entity to collect royalties for digital performances under the statutory licenses. SoundExchange, Inc. v. Muzak, LLC, 322 F.Supp.3d 72, 75 (D.C. 2018). SoundExchange then distributes the proceeds among artists, musicians, vocalists, and copyright holders as set forth in Section 114(g)(2). Id.

Section 114(g)(2) establishes how the proceeds from the licensing of digital audio transmissions are to be distributed:

> **(g) Proceeds from licensing of transmissions.—**[…]
> **(2)** Except as provided for in paragraph (6), a nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions in accordance with subsection (f) shall distribute such receipts as follows:
> **(A)** 50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.
> **(B)** 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) **to be distributed to nonfeatured musicians** (whether or not members of the American Federation of Musicians) who have performed on sound recordings.
> **(C)** 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) **to be distributed to nonfeatured vocalists** (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

Case 3:19-cv-02053-JAG   Document 37   Filed 09/19/22   Page 5 of 9

Rafael Ithier, et al. v. Carlos Juan Aponte, et al.
Civil No. 19-2053 (JAG)

> **(D)** 45 percent of the receipts shall be paid, **on a per sound recording basis, to the recording artist or artists featured on such sound recording** (or the persons conveying rights in the artists' performance in the sound recordings). 17 U.S.C. § 114(g)(2) (emphasis added).

Per Section 114(g)(2), 5% of the proceeds are to be distributed to nonfeatured musicians and nonfeatured vocalists, and 45% of the proceeds are to be distributed to recording artist(s) featured on each sound recording. The question here is who is a "recording artist featured" under Section 114(g)(2)(D) to be entitled to 45% of the proceeds from royalties collected by SoundExchange.

Aponte's arguments in favor of the position that he (as well as all other members of El Gran Combo) is a "featured artist" under the statute (entitled to a portion of 45% of the proceeds from royalties) can be summarized as follows. There is no clear definition of the term "featured artist" in the statute, but Section 114(g)(1)(A) does refer to a featured recording artist as one who "performs on a sound recording". According to Section 101 of the Copyright Act to "perform" a work is to "recite, play, dance, or act it, either directly or by means of any device or process." 17 U.S.C. § 101. Thus, as argued by Aponte, to be a "featured recording artist" one must be a human being able to perform on a sound recording. And a band such as El Gran Combo is incapable of "performing" as defined by statute. Aponte further sustains that because Sections 114(g)(2)(B) and (C) refer to nonfeatured musicians and nonfeatured vocalists—leaving out featured vocalists—lead singers would have to be considered "featured artists" under Section 114(g)(2)(D). Otherwise, the statute would grant more rights to a nonfeatured vocalist or backup singer than to a lead singer. Aponte also argues that, to the extent that SoundExchange defines a "nonfeatured artist" as "an artist who is not prominently featured on a sound recording, track, or album (i.e., a session musician or a back-up vocalist)", a lead singer cannot be a nonfeatured artist and must be a featured one.

Ithier insists that Aponte is a nonfeatured vocalist entitled to a portion of 2½% of the royalty proceeds under Section 114(g)(2)(C). Ithier's logic: "featured" means displayed, advertised or presented as a special attraction, and SoundExchange defines an "artist" as "the group, band, or individual name as it appears on the release of the recording". Ithier posits that, because El Gran Combo has always been the main attraction, it is the only possible "featured artist" under the statute and its owner is solely entitled to 45% of the proceeds of the royalties under Section 114(g)(2)(D). As to Aponte's argument that because he is a lead singer, he cannot fall

Case 3:19-cv-02053-JAG    Document 37    Filed 09/19/22    Page 6 of 9

Rafael Ithier, et al. v. Carlos Juan Aponte, et al.
Civil No. 19-2053 (JAG)

under the meaning of a nonfeatured vocalist, Ithier counters that, to the extent that the statute does not explicitly exclude a lead singer as a nonfeatured vocalist, the statute must be interpreted to allow the inclusion of a lead singer in Section 114(g)(2)(C) if that lead singer is not featured. That is, a singer may fall under Section 114(g)(2)(C) regardless of whether he is a lead singer or a back up singer; what matters is whether he is "featured" or prominently displayed on a sound recording, track, or album.

The material facts are not on dispute. Ithier is the owner of El Gran Combo. Aponte was a lead singer of approximately 200 sound recordings of the band. El Gran Combo and Aponte are two different artists, none of the albums released by the band identified any of its members by name in the cover (these only identified El Gran Combo), and the audiences paid to see El Gran Combo. Per the above, it is more than reasonable to conclude that El Gran Combo and not Aponte (or other members of the band) was the artist prominently displayed in the El Gran Combo sound recordings. The question then is whether by featuring El Gran Combo as a band, the members of the band were consequently "featured" for purposes of the distribution of royalties under Section 114 of the U.S. Copyright Act.

The Digital Performance Right in Sound Recordings Act of 1995 did not define the term "featured artist"; other than to state that the "featured artist" "performs on a sound recording". 17 U.S.C. § 114(g)(1)(A). The statute does distinguish between nonfeatured musicians and nonfeatured vocalists (Sections 114(g)(2)(B) and (C)) and featured artists (Section 114(g)(2)(D)) for purposes of the distribution of royalties under the statutory licensing scheme. While the statute is specific as to musicians and vocalists being entitled to royalties per Sections 114(g)(2)(B) and (C), it uses the more expansive term of "artist" to refer to those that are entitled to royalties under Section 114(g)(2)(D). And the parties do not dispute that El Gran Combo is an artist and is an artist that is different from Aponte. As such, the Court deems that, per the text of the statute, the band El Gran Combo may be a "featured artist" under Section 114(g)(2)(D).[1] See Bonneville Intern. Corp. v. Peters, 347 F.3d 484, 491 (3d Cir. 2003) (first step of statutory construction is the text of the statute). Aponte's argument regarding the definition of the action to "perform" under the U.S. Copyright Act is unpersuasive. The definition taken literally does appear to include actions that

---

[1] The parties do not dispute that SoundExchange defines "artists" as "the group, band, or individual name as it appears on the release of the recording"

Case 3:19-cv-02053-JAG    Document 37    Filed 09/19/22    Page 7 of 9

Rafael Ithier, et al. v. Carlos Juan Aponte, et al.
Civil No. 19-2053 (JAG)

can only be carried out by human beings. But to take that definition literally and insert it into Section 114 for purposes of excluding the band as a potential artist to be featured would be to ignore the explicit distinction that Section 114(g)(2)(D) makes when it uses the term "artist" rather than musicians or vocalists to refer to those that may be featured.[2] Under Aponte's logic, because all members of the band are automatically featured when the band itself is featured, the sections of the statute that provide for the payment of royalties to nonfeatured musicians and nonfeatured vocalists would be superfluous, at least as these relate to El Gran Combo.[3] Furthermore, under Aponte's logic a band alone (that is, the owner of the band) would never be entitled to the royalties under Section 114(g)(2)(D) regardless of whether the band is the only featured artist.[4] This result would be wholly inconsistent with the purpose of the amendments set forth by the Digital Performance Right in Sound Recordings Act of 1995; to grant **performing artists, record companies and copyright owners of sound recordings** digital audio transmission performance rights, **including the right to receive the payment of royalties on account of the statutory licenses created by the statute**. See S.Rep. 104-128 (1995) at p. 357 (emphasis added).

Nowhere in the statute is there an exclusion of vocalists (e.g., lead singers) in the "nonfeatured vocalist" group referred to in Section 114(g)(2)(C). The Court can only speculate as to why the SoundExchange website includes the letters "i.e.," rather than "e.g.," when it refers to some of the categories of artists (namely, session musicians or backup vocalists) that could be "nonfeatured artists". But the Court cannot assume, as Aponte proposes, that Congress' use of the term "nonfeatured vocalists" in Section 114(g)(2)(C) was intended to exclude lead singers. On the contrary, because Section 114(g)(2)(C)'s reference is to "nonfeatured vocalists" and a lead singer (featured or not) is a vocalist, the Court cannot but conclude that the statute contemplates the payment of royalties to nonfeatured lead singers under Section 114(g)(2)(C). See e.g., Bonneville

---

[2] Indeed, the Senate Report No. 104-128 dated August 4, 1995, in its analysis of Section 114(g)(2) distinguishes between nonfeatured musicians and nonfeatured vocalists "who have performed on sound recordings" in subparagraphs (B) and (C) and "featured artists or artists" (without reference to a performance) that are entitled to 45% of proceeds generated from royalties. See S.Rep. 104-128 (1995) at p. 378.

[3] El Gran Combo has three singers, two saxophone players, two trumpet players, a trombone player, a bass player, a pianist, a timbales player, a conga player, a bong player, and a director. DSMF at ¶ 3. If Aponte's argument were correct, all members of the band would be "featured artists" and non would be nonfeatured musicians and nonfeatured vocalists.

[4] Under Aponte's interpretation, the band would never be entitled to at least 50% of the royalties as it would not fall under the categories of musicians and vocalists in Sections 114(g)(2)(B) and (C) either.

Case 3:19-cv-02053-JAG    Document 37    Filed 09/19/22    Page 8 of 9

Rafael Ithier, et al. v. Carlos Juan Aponte, et al.
Civil No. 19-2053 (JAG)

Intern. Corp. v. Peters, 347 F.3d at 499 (more than congressional silence required in interpreting Section 114 of the Digital Performance Right in Sound Recordings Act of 1995). The foregoing is consistent with the legislative history of the Digital Performance Right in Sound Recordings Act of 1995. In Congress' analysis prior to approving the statute, the Senate Report clarified the following with respect to the term "featured recording artist" as used in another subsection of Section 114:

> The term "featured recording artist" means the performing group or ensemble or, if not a group or ensemble, the individual performer, **identified most prominently in print on, or otherwise in connection with, the phonorecord actually being performed**. Except in the case of a sound recording consisting of a compilation of sound recordings by more than one performer or group or ensemble, **there will ordinarily be only one "featured recording artist" per phonorecord**. **A vocalist or soloist performing along with a group or ensemble is not a "featured recording artist" unless that person is identified in connection with the phonorecord as the primary performer.** For example, the Eagles would be the "featured recording artist" on a track from an Eagles album that does not feature Don Henley by name with equal prominence; but if the same sound recording were performed from "Don Henley's Greatest Hits," then Don Henley and not the Eagles would be the "featured recording artist." Where both the vocalist or soloist and the group or ensemble are identified as a single entity and with equal prominence (such as "Diana Ross and the Supremes"), both the individual and the group qualify as the "featured recording artist." S. REP. 104-128, 36, 1995 U.S.C.C.A.N. 356, 383.

This same explanation was included in the Proceedings and Debates of the 104th Congress, First Session dated August 8, 1995. 141 Cong. Rec. S11945-04 at S11956-S11957 (1995). Per the foregoing explanation and concrete example in the legislative history of Section 114, lead singers such as Aponte may be featured recording artists if they are in fact featured; otherwise only the band would be the featured recording artist. See e.g., Bonneville Intern. Corp. v. Peters, 347 F.3d at 495-497 (considering other sections of the statute and legislative history to draw conclusions on statutory interpretation of Section 114).

There is no dispute that the band El Gran Combo was the artist "most prominently included in print on, or otherwise in connection with, the phonorecord actually being performed." Aponte's name was not featured in album covers or otherwise promoted as the main attraction for live

Case 3:19-cv-02053-JAG   Document 37   Filed 09/19/22   Page 9 of 9

Rafael Ithier, et al. v. Carlos Juan Aponte, et al.
Civil No. 19-2053 (JAG)

audiences. There is nothing to conclude that El Gran Combo and Aponte were featured by name with equal prominence. The Court thus concludes that the band El Gran Combo (and, consequently, its owner) is the artist featured in the El Gran Combo sound recordings entitled to 45% of the proceeds of royalties as set forth in 17 U.S.C. § 114(g)(2)(D).

### IV. Conclusion

For the reasons discussed above, the Court recommends that Aponte's motion for summary judgment at Docket No. 20 be **DENIED** and that Ithier's motion for summary judgment at Docket No. 23 be **GRANTED**, and that the Court issue a declaration consistent with this recommendation.

This Report and Recommendation is issued pursuant to 28 U.S.C. §636(b)(1) and Rule 72(d) of the Local Rules of this District Court. Pursuant to Local Rule 72(d), the parties have fourteen (14) days to file any objections to this Report and Recommendation. Failure to file timely and specific objections within the specified time waives the right to review in the District Court and those claims not preserved by such objections are precluded on appeal. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccarone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Secretary of Health and Human Services, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 19th day of September 2022.

s/Giselle López-Soler
GISELLE LÓPEZ-SOLER
United States Magistrate Judge